FILED

DEC 05 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | | |
|---|---|---|
| In re: | ) | BAP No. AZ-14-1172-JuKiD |
| | ) | |
| DUNLAP OIL COMPANY, INC.; | ) | Bk. No. AZ-12-23252-BMW |
| QUAIL HOLLOW INN, LLC, | ) | Bk. No. AZ-12-23256-BMW |
| | ) | (jointly administered) |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| PINEDA GRANTOR TRUST II; | ) | |
| PINEDA REO, LLC, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[*] |
| | ) | |
| DUNLAP OIL COMPANY, INC.; | ) | |
| QUAIL HOLLOW INN, LLC, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on November 20, 2014
at Phoenix, Arizona

Filed - December 5, 2014

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Brenda Moody Whinery, Bankruptcy Judge, Presiding

_____

Appearances:     Bradley D. Pack of Engelman Berger, P.C. argued for appellants Pineda Grantor Trust II and Pineda REO, LLC; Lindsi M. Weber of Gallagher & Kennedy, P.A., argued for appellees Dunlap Oil Company, Inc. and Quail Hollow Inn, LLC.

_____

Before:  JURY, KIRSCHER, and DUNN, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

-1-

Appellants Pineda Grantor Trust II and Pineda REO, LLC (collectively, Pineda) appeal from the bankruptcy court's order confirming the second amended joint plan (SAJP) filed by chapter 11[1] debtors, Dunlap Oil Company, Inc. (DOC) and Quail Hollow Inn, LLC (QHI).  We AFFIRM.

## I.  FACTS

**A.  Prepetition Events**

DOC was founded in 1959.  It owned, operated, and leased gas stations and convenience stores throughout Arizona, owned and operated a shopping center known as Dunlap Plaza, and owned vacant land.  Kenneth and Carol Dunlap, their two trusts,[2] and their son Theodore (Ted) Dunlap are shareholders of DOC.

The Dunlap Revocable Trust owned and operated an 83-room hotel in Wilcox, Arizona, under the Best Western brand.  The trust conveyed the hotel to QHI in June 2012.

Financing for the acquisition, development, and operation of debtors' businesses was primarily provided by Canyon Community Bank (CCB) and Compass Bank (Compass).  CCB loaned DOC in excess of $8 million which was secured by four properties owned by DOC.  Compass also made a series of loans to DOC which were evidenced by promissory notes and secured by seven

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure and "Civil Rule" references are the Federal Rules of Civil Procedure.

[2] The two trusts were The Kenneth T. Dunlap and Carol A. Dunlap Revocable Trust (Dunlap Revocable Trust) and The Kenneth T. Dunlap and Carol A. Dunlap Irrevocable Trust (Dunlap Irrevocable Trust).

-2-

properties owned by DOC and certain assets owned by QHI. Ken and Carol Dunlap, the Dunlap Revocable Trust, and Ted Dunlap were guarantors on the Compass loans.

Each of the Compass notes matured by their terms and DOC did not pay them off. Following DOC's default, the notes were modified through a series of modification and forbearance agreements whereby Compass agreed to forebear from taking any action to enforce the notes provided debtors remained in compliance with certain payment terms and other conditions. The forbearance obligation terminated on November 25, 2009. Debtors made no payments on the notes for several years. In October 2012, Compass sought to have a receiver appointed in the state court.

**B.    Bankruptcy Events**

Before Compass could post the bond required for the receivership to take effect, DOC and QHI each filed a chapter 11 petition on October 24, 2012. The bankruptcy court ordered the cases jointly administered.

Compass and CCB were debtors' primary secured creditors. Debtors also were delinquent on their real property taxes for most, if not all, of their properties. At the time of the filing, debtors owed Compass approximately seven million dollars.

**1.    The Cash Collateral Orders**

Early on, the bankruptcy court entered an interim order authorizing debtors to use cash collateral to pay ordinary and necessary postpetition expenses consistent with the attached budgets for each debtor. In November 2012, the bankruptcy court

-3-

entered a final order approving debtors' use of cash collateral as set forth in the interim order and attached budgets. The final cash collateral order stated that it was entered "without prejudice to any creditor seeking further relief upon motion for good cause shown."

Around this same time, Compass sold its interest in the notes to Pineda. As a result, Pineda maintained that it was the successor-in-interest to Compass, having received an assignment of all of Compass' right, title and interest in and to Compass' loans to DOC, and all loan agreements, promissory notes, security agreements, deeds of trust, guarantees and all other documents and agreements relating to or evidencing such loans. Pineda then challenged debtors' authority to use its cash collateral.

Pineda required, as a condition to use of its cash collateral, additional adequate protection, including monthly adequate protection payments and debtors' agreement to maintain a level of inventory consistent with its pre-petition inventory levels. As a result of these demands, Pineda and debtors entered into a stipulation regarding use of Pineda's cash collateral. Pineda agreed not to challenge debtors' use of cash collateral and, in exchange, debtors agreed to (1) maintain a level of inventory that was reasonably consistent with the inventory maintained prior to the petition date; (2) provide Pineda's counsel with a monthly report detailing the amount of the inventory; and (3) remain in compliance with the terms of the final cash collateral order and budgets.

The bankruptcy court approved the continued use of cash

collateral several times.

### 2. Debtors' Joint Plan Of Reorganization

Debtors reached stipulated valuations with Pineda and CCB for purposes of § 506(a) in connection with some of the real properties for purposes of plan confirmation. Debtors and Pineda stipulated that the liquidation value of the QHI hotel was $1.9 million.

Debtors filed a joint plan of reorganization on December 28, 2012. The plan proposed a partial dirt-for-debt swap, whereby DOC would deed certain collateral to CCB and Pineda for a credit against the secured debt and retain the remaining collateral. Debtors proposed to transfer the Benson Chevron, Benson Little General, QHI, and Sierra Vista Chevron to Pineda in exchange for a credit in the total amount of $4,361,758, after accounting for the outstanding taxes relating to these properties.

The secured creditors would have secured claims equal to the value of the retained collateral, the balance of their claims would be classified as unsecured, and the secured claims would be paid on the basis of a twenty-five year amortization with interest at 5%. Debtors would make balloon payments to the secured creditors after five years.

Debtors proposed to fund the plan through revenue from continued operation of the retained properties and a $150,000 new value contribution. Unsecured creditors would be paid from debtors' net revenue, if any, remaining after payment of operating expenses and installment payments to secured creditors. Shareholders would retain their equity interest in

DOC and QHI would transfer the hotel to Pineda.[3]

Pineda, CCB, and others objected to debtors' plan. Pineda argued that (1) the plan was not fair and equitable under § 1129(b)(1); (2) debtors' proposed interest rate of 5% failed the fair and equitable test; (3) the plan was not fair and equitable because it violated the absolute priority rule and the proposed new value contribution failed as a matter of law; (4) the plan was not feasible under § 1129(a)(11) because the projections were unreliable; and (5) the plan was not filed in good faith under § 1129(a)(3). Pineda also objected to the proposed return of the Benson Chevron in exchange for a credit because this property did not secure Pineda's claim. Pineda maintained that it could not be compelled to accept title to this property in satisfaction of any part of its claim.

Debtors subsequently filed a first amended joint plan (FAJP) that provided for debtors to retain the Benson Chevron as well as the QHI hotel.

In support of confirmation, debtors submitted the declaration of Steven Odenkirk, a member of Peritus Commercial Finance (Peritus), who had assisted debtors in reaching workout solutions with various creditors for three years prior to the bankruptcy filing. Mr. Odenkirk opined that the plan was feasible based on historical projections and that a 5% cramdown

---

[3] Meanwhile, Pineda moved for relief from stay with respect to the hotel and real property collateral owned by DOC. Pineda maintained that stay relief was appropriate due to a lack of adequate protection, lack of equity in the properties, and the properties were not necessary for effective reorganization. The bankruptcy court set the final relief from stay hearings concurrently with the hearing on confirmation.

interest rate was appropriate. Debtors also submitted the declaration of Ted Dunlap, the president of DOC. He too opined that the plan was feasible and confirmed the new value contribution from the equity holders in the amount of $150,000.

Pineda did not submit a declaration of its own expert, but CCB submitted the declaration of Mark A. Farr in opposition. Mr. Farr, the vice president of CCB, concluded that debtors' plan was not feasible. He opined that Mr. Odenkirk's analysis was flawed because he used only favorable historical information from a five-year period to validate the income projection. Mr. Farr also pointed out other discrepancies with Mr. Odenkirk's analysis.

On June 12 and July 11, 2013, the bankruptcy court held hearings on confirmation. At the first hearing, debtors agreed to stay relief with respect to the properties they proposed to give back to Pineda and CCB, which were their most unprofitable locations.[4] After the second hearing, the bankruptcy court took the matter under advisement. The parties completed post-trial briefing by August 13, 2013.

**3.    Debtors Fail To File Operating Reports**

Debtors failed to file operating reports for June and July 2013. In August 2013, CCB filed a motion to compel debtors to provide monthly operating reports for those months. After receiving those reports only from DOC, CCB filed a second motion in late September to compel debtors to provide the operating

---

[4] The bankruptcy court subsequently entered stipulated orders for relief from stay on these properties.

-7-

report for August 2013. Pineda joined in that motion, noting that QHI had failed to file operating reports for the months of May, June, July, and August 2013. Pineda argued that debtors' failure to file the operating reports constituted cause for the conversion or dismissal of the case. Pineda further asserted that the bankruptcy court could consider these reports, which showed continuing losses, when weighing the feasibility of debtors' plan.

The bankruptcy court heard the motions to compel on October 17, 2013, and ordered debtors to file the operating reports by the following Friday. Debtors complied. QHI's June 2013 operating report showed an unauthorized transfer of $177,000 of cash, reflected only as a disbursement to "other."[5]

After receiving the late-filed reports, Pineda filed a motion for immediate stay relief and termination of cash collateral authority or, alternatively, a motion to convert the case to chapter 7. Pineda argued that QHI's undisclosed and unauthorized transfer of $177,000 was a serious violation of the bankruptcy court's cash collateral orders and its duties as a debtor-in-possession. On the same day, CCB filed a motion to convert debtors' case to chapter 7 based on, among other things, QHI's unauthorized use of cash collateral.

---

[5] As further explained below, these funds were transferred to an entity by the name of KT Market which was formed and owned by the Dunlaps. KT Market, a grocery store, subleased space in the Dunlap Plaza shopping center from an anchor tenant that had gone out of business. Ted Dunlap explained that the money was used for tenant improvements and that without an anchor tenant such as the grocery store, the shopping center would lack corresponding revenue.

## 4. The Bankruptcy Court Denies Confirmation Of Debtors' FAJP.

On November 18, 2013, the bankruptcy court orally recited its findings of fact and conclusions of law on the record, denying confirmation of debtors' FAJP plan and granting the motions for relief from stay previously filed by CCB and Pineda. The bankruptcy court observed that debtors made the unauthorized intercompany loan of $177,000 in direct violation of the cash collateral orders. Due to this violation, the bankruptcy court concluded that debtors violated § 1129(a)(2), which requires the plan proponent to comply with all applicable provisions of Title 11, and also failed to act in good faith pursuant to § 1129(a)(3).

Next, the bankruptcy court found that the feasibility requirement was not met under § 1129(a)(11) because debtors provided no evidence that there was a reasonable likelihood that they could obtain future financing to make the balloon payment. The court also noted that debtors had suffered, and continued to suffer, increasing operating losses and a severe depletion of inventory and available cash, even after they ceased operations at the four locations on which stay relief was granted. Additionally, the court found that debtors' operating reports showed that they did not have sufficient cash to meet the effective date payments, the remaining administrative claims, and the monthly payments to secured creditors, which would be required to commence under the plan.

In the end, since the provisions of § 1129(a)(2), (3), and (11) were not met, the bankruptcy court denied confirmation of

debtors' FAJP. The bankruptcy court entered the order, which incorporated its oral ruling denying confirmation of debtors' FAJP, on November 19, 2013.

### 5. Debtors' Motion For Reconsideration

Debtors moved for reconsideration of the bankruptcy court's order. At the December 17, 2013 hearing on the matter, debtors' counsel argued that feasibility was no longer an issue because (1) the equity holders would contribute an additional $100,000 in new value; (2) Mr. Martin[6] and Ted Dunlap agreed to a combined $50,000 salary deferral which would free up additional cash; and (3) DOC's fuel supplier, Jackson Oil, would provide a $200,000 fuel credit which would allow DOC to "fill its tanks."

In support, debtors filed the declarations of Ted Dunlap, who confirmed the additional new value contribution, and Mr. Odenkirk, who concluded that with these new developments the income and expense projections would support feasibility.

The bankruptcy court found that debtors' arguments did not meet the requirements for reconsideration under Rule 9024, but essentially suggested a revised plan. Accordingly, the court denied debtors' motion, but noted that its ruling did not preclude debtors from filing an amended plan to address the issues that they raised concerning the additional funding and feasibility. The bankruptcy court also decided that it would enter the orders granting Pineda's and CCB's motions for relief from stay, but that it would not rule on their motions to convert or dismiss at that time.

---

[6] Mr. Martin is debtors' comptroller.

-10-

**6.    The Bankruptcy Court Confirms Debtors' SAJP.**

On December 27, 2013, debtors filed the SAJP. The SAJP differed from the FAJP in that, among other things, it provided for the sale of the QHI hotel. Upon the closing of the sale and payment of the outstanding secured real property taxes, Pineda would receive the stipulated value of the hotel, and the excess proceeds would be transferred to DOC. The SAJP further provided that the proposed sale would close within six months of the effective date of the plan.

The amended plan also stated that the new value contribution from equity holders would be increased from $150,000 provided in the initial plan to $250,000. In addition, the equity holders agreed to a real property new value contribution consisting of a fee simple interest in two properties known as Benson Little General and Benson Chevron. The Dunlap Revocable Trust owned the Benson Little General, which is a gas station/convenience store located in Benson, Arizona, and the Dunlap Irrevocable Trust owned Benson Chevron. Debtors reported that (1) they had received favorable credit terms from certain suppliers which were projected to realize between $30,000 to $45,000 in additional cash on an annual basis; (2) Jackson Oil committed a $200,000 line of credit for fuel purchases; (3) additional cash would also be freed up due to salary deferrals in the annual amount of $50,000; and (4) cashing in a $100,000 key man insurance policy would also provide liquidity for the plan.

Pineda moved to vacate the confirmation hearing scheduled for January 28, 2014, on the grounds that debtors could not

proceed to confirmation without a newly approved disclosure statement and re-solicitation of votes. In the alternative, Pineda requested the court to continue the confirmation hearing so that it could conduct discovery.

Debtors filed an emergency motion seeking to extend the stay of the orders granting Pineda and CCB relief from stay.

The bankruptcy court heard Pineda's motion to vacate and debtors' motion to extend the stay on January 13, 2014. The court concluded that debtors should be given the opportunity to amend their plan. The court stated, however, that the confirmation hearing on the SAJP was not open-ended. Rather, debtors would be allowed to address the issues which caused the prior denial of confirmation. The bankruptcy court also decided that no new disclosure statement or balloting was necessary, and it extended the stay on the relief from stay orders until the confirmation hearing was completed. The court rescheduled the confirmation hearing for February 7, 2013.

Pineda and debtors thereafter entered into a stipulated order incorporating the bankruptcy court's ruling as well as establishing certain procedural matters agreed to by the parties. The order provided that at the evidentiary hearing on confirmation, the bankruptcy court would consider evidence relating to feasibility, debtors' compliance with § 1129(a)(2), debtors' good faith, debtors' ability to make plan payments required under § 1129(a)(9) (secured tax claims), and satisfaction of the new value exception to the absolute priority rule, as well as evidence relating to the value of the QHI hotel. In addition, the bankruptcy court would consider the

-12-

testimony and exhibits admitted at the hearings on confirmation of debtors' FAJP. The bankruptcy court entered the order on January 16, 2014.

On January 28, 2014, debtors filed a notice of plan amendments which further modified the SAJP. The plan was amended to allow CCB and Pineda to continue orally any trustee sales during the twelve months following the effective date and to allow such sales to proceed if a default occurred under the plan that debtors failed to cure. Another amendment provided that certain tax claims were re-amortized over forty-four months rather than sixty months so debtors could complete payments within sixty months of the petition date.

Pineda objected to confirmation of the SAJP on the grounds that (1) issue preclusion[7] and the law of the case doctrine precluded re-litigation of the issues concerning debtors' violations of the cash collateral orders, bad faith, and their inability to reorganize within a reasonable period of time; (2) debtors continued to make unauthorized transfers of cash after the bankruptcy court denied debtors' FAJP; (3) the provisions for the sale of the hotel impermissibly stripped Pineda of its right to credit bid in violation of § 1129(b)(2)(A)(ii); (4) all proceeds from the sale of the hotel must be paid to Pineda to be applied against its secured claim; and (5) there were multiple grounds for conversion of debtors'

---

[7] "Issue preclusion" is the more modern nomenclature for "collateral estoppel." See Paine v. Griffin (In re Paine), 283 B.R. 33, 38 (9th Cir. BAP 2002) (noting that "issue preclusion" includes the doctrines of direct estoppel and collateral estoppel).

cases.

Pineda also filed a notice of recorded judgment in the amount of $7 million dollars against Ken and Carol Dunlap, the Dunlap Revocable Trust, and Ted Dunlap based on their respective guarantees of the loans. Due to its recorded judgment, Pineda objected to the SAJP to the extent it adversely affected its right to foreclose its judgment lien on the Benson Chevron, which the Dunlaps proposed to contribute to DOC to assist in DOC's reorganization.

On February 6, 2014, debtors filed a second notice of plan amendments, which provided, among other things, that if the sale of the hotel did not close within six months, debtors would transfer the hotel to Pineda in exchange for a credit against Pineda's secured claim in the amount of the stipulated value, less secured taxes. They also filed a memorandum in support of confirmation and in response to confirmation objections.

On February 7, 2014, the bankruptcy court held the evidentiary hearing on confirmation. Direct testimony was provided by the supplemental declarations of Mr. Odenkirk and Ted Dunlap in support and Mr. Farr in opposition. Cross examination and redirect of each of the declarants was conducted live.

At the conclusion of the hearing, the bankruptcy court found that the stipulated value of the QHI hotel relied upon in the context of the FAJP was not binding upon Pineda given that the SAJP contemplated a sale of the hotel. The court also gave the parties the option to submit closing briefs.

Based upon the evidence presented at the confirmation

-14-

hearing, the bankruptcy court entered an order on February 14, 2014, finding that the value of the hotel was $2.5 million for purposes of confirmation of the SAJP.

After the hearing, debtors submitted a brief in support of confirmation and response to confirmation objections and a closing brief. Pineda filed a summary of unauthorized intercompany transfers and a closing brief. Pineda argued that debtors made intercompany transfers which were unauthorized and failed to explain how they used the $177,000 in funds. Pineda noted that the invoices debtors produced in response to Pineda's request for all documents showing how the funds were used reflected purchases totaling only $35,173.75. According to Pineda, debtors provided no explanation as to how the remaining $142,000 in funds were spent. Finally, Pineda maintained that the evidence did not support debtors' argument that the transferred funds were repaid. With respect to feasibility, Pineda asserted that debtors failed to demonstrate they would have enough cash on the effective date to pay administrative claims and there was no evidence that the new value contribution would actually be funded.

Given the bankruptcy court's ruling on valuation of the QHI hotel, on February 14, 2014, debtors filed a third notice of plan amendments whereby they proposed to transfer the hotel property to Pineda on the effective date of the plan, subject to secured tax claims. According to debtors, this amendment was intended to resolve any objections to the plan raised by Pineda relating to its treatment with respect to the QHI hotel.

Shortly thereafter, the bankruptcy court entered an order

-15-

requiring debtors to strictly comply with the terms of the cash collateral orders and prohibiting any transfers of cash collateral from QHI to insiders or affiliates except for ordinary salary or payroll obligations or reimbursement to DOC for ordinary payroll expenses and tax obligations.

Debtors filed a notice of funds regarding the new value contribution. This notice stated that $139,000 had been received from the key man life insurance policy and that additional funds in the amount of $111,000 would be obtained from a business acquaintance and would be available upon entry of the confirmation order.[8]

On March 6, 2014, the bankruptcy court read its ruling granting confirmation of the SAJP into the record.[9] The bankruptcy court entered the order confirming the SAJP on March 12, 2014. As a condition of confirmation, the order required that all amounts owed to QHI from KT Market must be repaid on or prior to the effective date. The effective date of the plan was March 28, 2014.

### 7. Pineda's Motion To Alter Or Amend The Confirmation Order Under Rule 9024

Pineda moved to alter or amend the order pursuant to Rule 9024. Pineda maintained that (1) the confirmation order should expressly provide that QHI would transfer the hotel to a

---

[8] It is not entirely clear from the record whether the key man life insurance policy was used to credit part of the $250,000.

[9] The bankruptcy court's ruling is discussed in further detail below in connection with Pineda's arguments on appeal.

-16-

special purpose entity designated by Pineda, rather than being transferred directly to Pineda; (2) the confirmation order should require QHI to account for and immediately turn over to Pineda all accumulated cash collateral, plus all personal property; (3) the plan amendments made after confirmation required the hotel to be revalued at its liquidation value of $1.9 rather than the sale value of $2.5 million.

Pineda also filed an emergency motion to prohibit Ken and Carol Dunlap and their trust from transferring to DOC the cash surrender proceeds of a key man life insurance policy and the fee simple interests in Benson Little General and Benson Chevron to DOC. Since Ken and Carol Dunlap had filed a bankruptcy petition themselves, Pineda maintained that the proceeds from the life insurance policy and the Benson properties were property of the Dunlaps' bankruptcy estate.

In addition, Pineda filed a motion to stay the confirmation order pending resolution of the above-referenced motions and sought an expedited hearing.

The bankruptcy court heard Pineda's motions on March 27, 2014. The court denied the stay of the effective date of the plan and denied Pineda's motion to alter or amend the confirmation order.

**8.    Pineda Appeals**

On April 10, 2014, Pineda filed its notice of appeal of the order confirming debtors' SAJP.

On September 24, 2014, the Panel issued an order for supplemental briefing on whether this appeal had become moot. The parties subsequently submitted their supplemental briefs and

-17-

supplemental record on the mootness issue.

## II. JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(L). Because the SAJP has been confirmed, distributions commenced, properties transferred, and there is no stay pending appeal of the confirmation order, the question arises whether this appeal is moot and subject to dismissal. If an appeal is constitutionally moot, we must dismiss. Drummond v. Urban (In re Urban), 375 B.R. 882, 887 (9th Cir. BAP 2007). Moreover, we may dismiss if equitably moot. Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC), 391 B.R. 25, 33-35 (9th Cir. BAP 2008). We consider the mootness question below and conclude that the appeal is not constitutionally or equitably moot. Therefore, we have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

A. Whether this appeal is moot;

B. Whether the bankruptcy court erred in finding that debtors complied with § 1129(a)(2);

C. Whether the bankruptcy court erred in finding that debtors had satisfied the requirements for feasibility under § 1129(a)(11);

D. Whether the bankruptcy court erred in finding that the proper cramdown interest rate was 5%; and

E. Whether the bankruptcy court erred in finding that the requirements for the new value exception to the absolute priority rule were satisfied.

-18-

# IV. STANDARDS OF REVIEW

Mootness is a question of law reviewed de novo. Nelson v. George Wong Pension Trust (In re Nelson), 391 B.R. 437, 442 (9th Cir. BAP 2008).

We review the bankruptcy court's ultimate decision to confirm a chapter 11 reorganization plan for an abuse of discretion. Computer Task Grp., Inc. v. Brotby (In re Brotby), 303 B.R. 177, 184 (9th Cir. BAP 2003). We apply a two-part test to determine whether the bankruptcy court abused its discretion. United States v. Hinkson, 585 F.3d 1247 (9th Cir. 2009) (en banc). We first determine de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested." Id. at 1251. If it did, we then determine "whether [the bankruptcy court's] application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" Id. If any of these three determinations applies, we may be left with a definite and firm conviction that the bankruptcy court abused its discretion in making a clearly erroneous factual finding. Id.

"Of course, a determination that a plan meets the requisite confirmation standards necessarily requires a bankruptcy court to make certain factual findings and interpret the law." In re Brotby, 303 B.R. at 184.

The issue whether a plan is feasible — is not likely to be followed by liquidation or further reorganization — is one of fact, which we review under the clearly erroneous standard. Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352,

1358 (9th Cir. 1986).

The bankruptcy court's application of the factors under the formula approach articulated in Till v. SCS Credit Corp., 541 U.S. 465 (2004), to this case is a question of fact reviewed for clear error. We give substantial deference to the bankruptcy court in making cramdown interest rate determinations. In re Yett, 306 B.R. 287, 290 (9th Cir. BAP 2004) (citing Farm Credit Bank v. Fowler (In re Fowler), 903 F.2d 694, 696 (9th Cir. 1990)); In re Red Mountain Mach. Co., 451 B.R. 897, 905-06 at n.19 (Bankr. D. Ariz. 2011).

"[W]hether a particular plan gives old equity a property interest 'on account of' its old ownership interests in violation of the absolute priority rule or for another, permissible reason is a factual question." In re Red Mountain Mach. Co., 451 B.R. at 905-06 n.18.

In reviewing factual findings, if the bankruptcy court's "account of the evidence is plausible in light of the record viewed in its entirety," the appellate court may not reverse, even if it was convinced that it would have weighed the evidence differently. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id.

We may affirm the bankruptcy court on any basis supported by the record. Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

# V. DISCUSSION

## A. Pineda's Appeal Of The Order Confirming Debtors' SAJP Is Not Moot.

In analyzing constitutional mootness, the appellate court asks whether it can give the appellant "any effective relief in the event that it decides the matter on the merits in [its] favor. If it can grant such relief, the matter is not moot." Felton Pilate v. Burrell (In re Burrell), 415 F.3d 994, 998 (9th Cir. 2005). We conclude that this appeal is not constitutionally moot because we could reverse plan confirmation or require modification of the SAJP, thereby giving relief to Pineda.

The equitable mootness question requires more analysis due to the Ninth Circuit's "comprehensive test" for determining whether an appeal is equitably moot:

> We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. Next, we will look to the effect a remedy may have on third parties not before the court. Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 881 (9th Cir. 2012).

In applying these factors to this case, we decline to dismiss this appeal on equitable mootness grounds.[10] Although

---

[10] Pineda's supplemental brief on mootness mostly discussed debtors' conduct after confirmation and issues which remained

(continued...)

Pineda sought a stay from the bankruptcy court and did not seek one from the Panel, "failure to obtain a stay is one factor to be considered in assessing equitable mootness, but is not necessarily controlling." Id. at 881-82.

Moreover, the plan may be substantially consummated as defined in § 1101(2): "Substantial consummation means (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." Debtors have transferred certain real property to its secured creditors, including Pineda, in compliance with the plan, assumed management of the business and property dealt with by the plan, and commenced distributions to all classes of creditors.

However, even if the plan is substantially consummated, we can "still assess whether effective relief might be given without fully impairing the prior plan and other pertinent circumstances." In re Thorpe Insulation Co., 677 F.3d at 882

[10](...continued)
unresolved in the confirmation order. Pineda argued that debtors failed to turn over Pineda's cash collateral from the QHI hotel, and debtors' distribution to unsecured creditors was not authorized and insubstantial. Moreover, Pineda maintains that the bankruptcy court's confirmation ruling left numerous outstanding issues unresolved such as the amount of Pineda's secured and unsecured claims and whether Pineda was entitled to an administrative claim. Other than bearing on whether the plan has been substantially consummated, these arguments, are irrelevant to the constitutional and equitable mootness analysis under Burrell and Thorpe.

-22-

n.7. We thus consider "whether modification of the plan of reorganization would bear unduly on the innocent." Id. at 882.

Debtors point out that some of the real property transferred to its secured creditors pursuant to the SAJP has been subsequently transferred to third parties. Debtors also maintain that other parties have acted in reliance on the plan and confirmation order. Specifically, the equity holders have contributed $250,000 to the plan from various sources, management took a reduction in salary to fund the first distribution to unsecured creditors under the plan, and third party suppliers, vendors, and customers have acted in reliance on the plan by extending favorable credit terms to assist with post-confirmation operations. Therefore, according to debtors, reversal of confirmation would unfairly prejudice these parties and would lead to an inequitable result for parties not even before this court.

We are not persuaded. Even if we adopted Pineda's position on appeal, debtors' transfer of the real properties to their secured creditors would not have to be modified since the estates were transferring those properties in any event,[11] and any distributions previously made to creditors would not have to be reduced. Further, although the equity holders made the required new value contribution, they do not qualify as "third parties" who are not before the court. Any adverse consequences to the equity holders were foreseeable as they opted to press

[11] What happened to the properties after the secured creditors took title is not pertinent.

-23-

forward with confirmation. Harm to debtors' management who agreed to reduced salaries and harm to vendors and suppliers who agreed to extend credit is lacking as well. Debtors have not explained in any detail what inequitable result might ensue to these groups if the confirmation order were reversed.

In sum, it would not be impossible for the bankruptcy court to fashion effective relief for Pineda nor has there been such a comprehensive change of circumstances to render it inequitable to consider the merits of the appeal. Focus Media, Inc. v. Nat'l Broad. Co., Inc. (In re Focus Media, Inc.), 378 F.3d 916, 922-23 (9th Cir. 2004) (citing Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.), 652 F.2d 793, 798 (9th Cir. 1981)). "Where equitable relief, though incomplete, is available, the appeal is not moot." In re Thorpe Insulation Co., 677 F.3d at 883. As this appeal is not moot, we now turn to the merits.

**B.    Plan Confirmation**

Debtors had the burden of proving all the elements governing plan confirmation. Leavitt v. Soto (In re Leavitt), 209 B.R. 935, 940 (9th Cir. BAP 1997), aff'd, 171 F.3d 1219 (9th Cir. 1999); United States v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 653 (9th Cir. BAP 1994). The requirements for plan confirmation are listed in § 1129(a) (stating that the court shall confirm a plan only if all the following requirements have been met). If the only condition not satisfied is the eighth requirement, § 1129(a)(8), the plan must satisfy the "cramdown" alternative to this condition found in § 1129(b). Cramdown requires that the plan "does not discriminate unfairly" against and "is fair and equitable"

-24-

towards each impaired class that has not accepted the plan.

### 1. The Bankruptcy Court Did Not Err By Finding That The SAJP Complied With § 1129(a)(2).

Section 1129(a)(2) requires that the plan proponent comply with the applicable provisions of the Bankruptcy Code. The section's primary purpose is to assure that the plan proponents have complied with the disclosure and solicitation requirements of §§ 1125 and 1126. See In re MacGibbon, 2006 WL 6810935, at *9 (9th Cir. BAP August 14, 2006) (Section 1129(a)(2) primarily addresses adherence to the disclosure and solicitation provisions in §§ 1125 and 1126); In re Sierra-Cal, 210 B.R. 168, 173 (Bankr. E.D. Cal. 1997) (Adequacy of disclosure is an essential element for plan confirmation by way of § 1129(a)(2)). However, bankruptcy courts have interpreted § 1129(a)(2) to require the plan proponent's compliance with court orders issued in furtherance of the reorganization process. See In re Multiut Corp., 449 B.R. 323, 339 (Bankr. N.D. Ill. 2011) (citing In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000)).

Some courts have strictly construed § 1129(a)(2) and denied plan confirmation for any violation of the Bankruptcy Code. See In re Greate Bay Hotel, 251 B.R. at 236-37 (collecting cases). Other courts have taken a more lenient approach:

> Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code. In fact, the legislative history mentions the provision only in passing, offering as an example of compliance that the debtor meet the disclosure requirements of § 1125 to satisfy § 1129(a)(2). Certainly, if Congress had meant that any infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the

-25-

violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express.

In re Landing Assocs., Ltd., 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993). "Nonetheless, 'serious violations of the Bankruptcy Code by a [proponent] can and should result in a denial of confirmation of a plan under § 1129(a)(2).'" In re Greate Bay Hotel, 251 B.R. at 237 (quoting In re Landing Assocs., 157 B.R. at 810).

In deciding that § 1129(a)(2) did not preclude confirmation of debtors' SAJP, the bankruptcy court found:

[I]t is clear that the transfers between DOC and QHI have been occurring since the beginning of the case. There does not appear to be any bad intent or improper use of such funds. Neither Pineda nor CCB raised any objection to such practices except with respect to the $177,000 loan to a non-debtor entity, all but [$]23,000 of which has been repaid.

While the court does not condone the debtors' failure to seek court approval with respect to the non-debtor loan, given the explanations provided, the court is not going to use this one issue to preclude consideration of the second-amended plan . . . .

Pineda argues on appeal that the bankruptcy court misapplied § 1129(a)(2) to the facts of this case and thus erred as a matter of law in confirming the SAJP. Pineda asserts that it is undisputed that debtors made the $177,000 intercompany transfer and it was not fully repaid. Pineda further maintains that § 1129(a)(2) mandates compliance with court orders regardless of debtors' intent.

Relying on Multiut, Pineda contends the facts in this case are analogous. There, a plan proponent professed a misunderstanding of a court order requiring a deposit of

-26-

$100,000. The debtor deposited just $70,000. When the debtor failed to provide evidence that the remaining $30,000 had been deposited following the court's clarification of this order, the court found § 1129(a)(2) was not satisfied and denied plan confirmation. In re Multiut, 449 B.R. at 341-42. Pineda argues that debtors' violations of the cash collateral orders throughout this case constitute an even more serious failure to comply with court orders than the failure to comply in Multiut.

Finally, Pineda asserts that it had no duty to constantly monitor debtors' conduct to determine whether they were complying with their fiduciary duties, and there is no evidence in the record that Pineda knew about the intercompany transfers in order to object. Pineda maintains that debtors had the obligation to comply with § 1129(a)(2) whether or not creditors objected to their violations of the cash collateral orders.

We have not had occasion to discuss the circumstances, if any, under which the violation of a court order should preclude confirmation under § 1129(a)(2) nor have we found Ninth Circuit precedent on point. Pineda advocates a rule that requires denial of confirmation where there are "serious" violations of a court's order. However, even if we were to adopt such a rule, the bankruptcy court has broad discretion to determine whether a particular violation of the court's order is so serious as to require denial of confirmation under § 1129(a)(2).[12]

_____

[12] Indeed, the bankruptcy court has the tools to fashion a number of remedies for violations of cash collateral orders under other sections of the Bankruptcy Code. See § 1112(b)(4)(D) and (E)(conversion or dismissal); § 1104(appointment of a chapter 11
(continued...)

On this record, we cannot say the bankruptcy court abused its discretion. The record shows that the bankruptcy court implicitly understood and applied the "serious violation" legal standard articulated in In re Greate Bay Hotel. In reaching its decision, the court neither condoned nor minimized debtors' conduct with respect to the intercompany transfers. Moreover, contrary to Pineda's assertions, in deciding whether debtors' violations of the cash collateral orders were so egregious as to preclude confirmation of the SAJP, the bankruptcy court did consider all relevant facts and circumstances such as debtors' intent, improper use of the funds, or debtors' failure to pay the funds back.

Here, Ted Dunlap provided a supplemental declaration regarding the $177,000 transfer from QHI to KT Market and the other intercompany transfers between debtors that had occurred throughout the case. Mr. Dunlap testified that the $177,000 transferred from QHI to KT Market were used to pay for freezer, electrical upgrades, signage, merchandise displays and other tenant needs for stocking and opening a grocery store in Dunlap Plaza. Mr. Dunlap explained that the plaza needed an anchor tenant after the two prior grocery store tenants vacated the space. He further testified that not a dime of the QHI loan went to the principals of DOC or QHI and that the funds were repaid either in full or mostly in full.

Finally, Mr. Dunlap explained that DOC provided payroll

[12](...continued)
trustee); § 363(e)(adequate protection).

-28-

functions for QHI and covered other expenses for QHI (including insurance and taxes). The transfers between DOC and QHI were largely for reimbursements for payment of QHI expenses that were and are a part of the cash collateral budgets. Mr. Dunlap testified that debtors did not believe the loan from QHI to KT Market or other ordinary course intercompany transfers were prohibited and that they did not intend to violate any court orders. Pineda had the opportunity to cross examine Mr. Dunlap at the confirmation hearing.

Given the bankruptcy court's findings regarding no bad intent or improper use of the funds, the bankruptcy court must have found Ted Dunlap's testimony credible. The court apparently was convinced by the evidence in the record that debtors repaid all but $23,000 of the funds to QHI. Moreover, as a condition of confirmation, the bankruptcy court required KT Market to pay all amounts owed to QHI prior to the effective date.

Here, the bankruptcy court's factual findings regarding no bad intent, no improper use of the funds, and substantial repayment are supported by the record and not clearly erroneous. Given these mitigating factors, the bankruptcy court could reasonably conclude that debtors' non-compliance with the cash collateral orders was not so egregious as to preclude confirmation of debtors' SAJP. If the bankruptcy court's "account of the evidence is plausible in light of the record viewed in its entirety," we cannot reverse even if we are convinced that we would have weighed the evidence differently. Anderson, 470 U.S. at 573-74. There is thus no basis for

reversal of the confirmation order on the grounds alleged.

> ### a. The Bankruptcy Court Did Not Err By Finding That The Law Of The Case Doctrine Was Inapplicable To Its Earlier Ruling Denying Confirmation Of Debtors' FAJP For Violation of § 1129(a)(2).

Next, Pineda argues that the bankruptcy court's prior determination that debtors' non-compliance with the cash collateral orders warranted denial of debtors' FAJP is the law of the case and, therefore, should be given preclusive effect in connection with the SAJP. Pineda further maintains that the bankruptcy court's earlier ruling was not clearly erroneous and nothing changed between the hearing on the FAJP and the hearing on the SAJP that would justify departure from the court's previous ruling.

The bankruptcy court found the law of the case doctrine inapplicable. The court noted that the doctrine was not a limitation on the court's power, but expressed only the practice of courts generally to refuse to reopen questions formerly decided. U.S. v. Maybusher, 735 F.2d 366, 370 (9th Cir. 1984). The bankruptcy court concluded that the doctrine did not preclude it from reexamining the issue of debtors' failure to comply with the court's orders in the context of the SAJP especially when its prior findings of non-compliance were made in support of an interlocutory order.

We agree with the bankruptcy court's ruling. The law of the case doctrine precludes a court from "reconsidering an issue that has already been decided by the same court . . . in the identical case." United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997). Application of the doctrine "is discretionary,

-30-

not mandatory" and is in no way "a limit on [a court's] power." City of L.A. v. Santa Monica Baykeeper, 254 F.3d 882, 888 (9th Cir. 2001); Maybusher, 735 F.2d at 370. The doctrine does not effect the bankruptcy court's power to reconsider its own interlocutory order denying confirmation of debtors' FAJP. A contrary conclusion would be irreconcilable with § 1127(a) which states that the plan proponent may modify a plan at any time before confirmation and Civil Rule 54(b), incorporated by Rule 7054, which states in relevant part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liability of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Accordingly, the bankruptcy court was not bound by the law of the case doctrine when it reconsidered or rescinded its prior decision concerning debtors' non-compliance with the cash collateral orders as grounds for denial of confirmation under § 1129(a)(2).

> **b.  The Bankruptcy Court Properly Found That The Claim And Issue Preclusion Doctrines Did Not Apply To Its Earlier Ruling Denying Confirmation Of Debtors' FAJP For Violation Of § 1129(a)(2).**

Pineda also relies on claim and issue preclusion to support its arguments under § 1129(a)(2).

Federal common law determines the preclusive effect of a federal judgment. Taylor v. Sturgell, 553 U.S. 880, 891 (2008); W. Sys., Inc. v. Ulloa, 958 F.2d 864, 871 n.11 (9th Cir. 1992). The party asserting issue preclusion must establish that (1) the issue was actually decided by a court in an earlier action,

-31-

(2) the issue was necessary to the judgment in that action, and (3) there was a valid and final judgment. N.H. v. Maine, 532 U.S. 742, 748 (2001). The doctrine of claim preclusion requires: (1) the identity of claims, (2) a final judgment on the merits, and (3) privity between the parties. Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 322 F.3d 1064, 1077 (9th Cir. 2003). On appeal, Pineda mentions only the finality element, which is required under either doctrine.

Citing Lievsay v. W. Fin. Savings Bank (In re Lievsay), 118 F.3d 661, 662 (9th Cir. 1997), the bankruptcy court found that neither doctrine applied because the order denying debtors' FAJP was interlocutory and not final. Pineda argues that this was in error because the bankruptcy court's orders granting it relief from stay were final. To connect the bankruptcy court's FAJP ruling with the relief from stay orders, Pineda asserts that the orders granting relief from stay were predicated on the same evidence the court relied upon for denial of confirmation. According to Pineda, it follows that debtors' non-compliance with the cash collateral orders as a basis for denial of plan confirmation was "necessarily decided" in connection with the relief from stay motions. Pineda then concludes, without analysis, that "all elements of res judicata and collateral estoppel were satisfied."

We disagree. Pineda did not argue before the bankruptcy court that the relief from stay orders provided an independent basis for application of the claim and issue preclusion doctrines. Because Pineda failed to raise this issue before the bankruptcy court, it has been waived. Consol. Mktg., Inc. v.

-32-

Marvin Props., Inc. (In re Marvin Props., Inc.), 854 F.2d 1183, 1187 (9th Cir. 1988). In any event, even if not waived, Pineda's reliance on the final relief from stay orders does not aid its position. As noted above, the bankruptcy court could revisit its findings on plan confirmation at any time before entry of the confirmation judgment under Civil Rule 54(b). Further, relief from stay proceedings are primarily procedural; they determine whether there are sufficient countervailing equities to release an individual creditor from the collective stay. Johnson v. Righetti (In re Johnson), 756 F.2d 738, 740–41 (9th Cir. 1985). There is no indication that the bankruptcy court's denial of confirmation based on debtors' non-compliance with the cash collateral orders was "necessary" to the court's decision granting Pineda relief from stay. Accordingly, there is no basis for reversal of the confirmation order on claim or issue preclusion grounds.

## 2. The Bankruptcy Court Did Not Err By Finding That The SAJP Complied With § 1129(a)(11).

Section 1129(a)(11) provides that a plan is confirmable only if "[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Feasibility requires only that the debtor demonstrate that the plan has a "reasonable probability of success." In re Acequia, Inc., 787 F.2d at 1364. "The Code does not require the debtor to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy

-33-

§ 1129(a)(11) so long as adequate evidence supports a finding of feasibility." Wells Fargo Bank v. Loop 76, LLC (In re Loop 76, LLC), 465 B.R. 525, 544 (9th Cir. BAP 2012).

"If a final payment, in the form of a 'balloon' payment, is proposed to come from new financing to be acquired by the [d]ebtor in the form of some new lending vehicle, then proof of feasibility is necessary. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood." In re Seasons Partners, LLC, 439 B.R. 505, 515 (Bankr. D. Ariz. 2010).

In evaluating the feasibility of the SAJP, the bankruptcy court recited and recognized these standards. The court first considered the SAJP's provisions for implementing the plan. Payments under the plan would be funded through cash flow generated by the continued operations of the debtors' business; equity holders would infuse new capital in the amount of $250,000 and contribute their fee simple interests in the Benson Little General and Benson Chevron; debtors had received significant support from fuel and merchandise vendors that would generate an additional $30,000-$45,000 in additional cash on an annual basis; Jackson Oil had committed to a $200,000 line of credit available for fuel purchases upon confirmation of the plan; a $100,000 cash contribution from a key man life insurance policy would provide additional liquidity for the plan; and salary deferrals in the amount of $50,000 for Ted Dunlap and Mr. Martin would further assist with liquidity if needed. The bankruptcy court also noted that the transfer of the QHI hotel

-34-

to Pineda would mean that no proceeds from the hotel would be available to fund the plan, but it also meant that the secured payments to Pineda would be reduced by the value of its secured claim against the hotel, which would also improve feasibility of the plan.

With respect to the witness testimony, the bankruptcy court found Mr. Odenkirk's testimony credible. The bankruptcy court recited portions of Mr. Odenkirk's testimony that it found persuasive in its findings. First, Mr. Odenkirk concluded that based on the additional sources of cash and credit made available to debtors, and upon review of the financial impact of the updated credit offered to debtors by its vendors relating to fuel and merchandise sold by DOC, there should be ample cash available to purchase fuel and merchandise to meet projections. Next, Mr. Odenkirk confirmed that the Jackson fuel credit of $200,000 alone would allow DOC to purchase the one load of fuel per day needed to hit the projected fuel sales.

He also described how the increase in fuel supply would translate into greater sales and higher profits on the retained locations. Mr. Odenkirk explained that the debtors did not require vast amounts of inventory on hand at any given time. Rather debtors' fuel and merchandise inventory rotated on a daily or weekly basis, and consequently debtors would have access to more than enough inventory for the plan to succeed.

Finally, Mr. Odenkirk opined that DOC should be able to obtain financing for the balloon payments called for under the plan so long as the plan payments were made. The bankruptcy court noted that on this last point, the evidence was

-35-

uncontroverted.

The bankruptcy court also recited portions of Ted Dunlap's testimony that it relied upon. Ted Dunlap confirmed that debtors typically store approximately 50,000 to 65,000 gallons of fuel in their tanks at any given time, with the average being 50,000 gallons, and that this inventory is constantly rotating and being replaced. He further testified that the DOC stations were capable of storing and rotating approximately $200,000 in merchandise inventory, not the $800,000 suggested in Mr. Farr's analysis.

The bankruptcy court explained why it did not find Mr. Farr's testimony compelling. Mr. Farr was the only witness offered to controvert Mr. Odenkirk's testimony on feasibility. Mr. Farr is the vice-president of CCB, having worked as a commercial loan officer for over twenty-five years. He testified that he had not operated gas stations or convenience stores and had no particular expertise in this industry. He also did not prepare his own projections for DOC. During cross examination Mr. Farr admitted that there were errors in his analysis and that portions of his analysis regarding loss of cash and inventory at DOC since the petition date was not prepared by him but by CCB's counsel. The court also discredited Mr. Farr's argument that the cash position on the petition date and the current cash position were different because testimony and evidence showed that a few days after the petition date a significant payroll for both companies was paid that reduced cash to approximately the exact level of cash that existed as of December 31, 2013. Given Mr. Farr's failure to

-36-

prepare independent projections and the errors in his analysis, and considering his lack of independence in this matter, the bankruptcy court did not find his testimony compelling.

The bankruptcy court concluded that the totality of the evidence, including the increased funding and credit terms in the SAJP and the testimony of Mr. Odenkirk, combined with the testimony of Mr. Dunlap which the court found more credible than that of Mr. Farr, showed the SAJP was feasible within the meaning of § 1129(a)(11).

Pineda argues that the bankruptcy court erred in its feasibility analysis on several grounds. First, debtors' cash flow projections did not account for the full amount of Pineda's allowed secured claim, which includes the value of Pineda's lien on debtors' personal property and accumulated cash collateral. Second, the cash flow projections were based on the inaccurate assumption that Pineda would have no administrative claim for failed adequate protection. In this regard, Pineda maintains that the bankruptcy court's finding that sufficient funds should be available to pay the administrative claims due on the effective date was clearly erroneous. Pineda also contends the projections were not supported by the evidence because there was a glaring discrepancy between the projections and debtors' historical performance. Pineda points out that debtors did not once earn a profit during the six years prior to plan confirmation and posted a loss of nearly $9 million dollars from January 2008 through May 2013. According to Pineda, Mr. Odenkirk's testimony could not cure these flaws and he simply reviewed the projections debtors provided and checked

whether the math on the projections was correct.

Finally, Pineda asserts that debtors provided no evidence of their ability to make the balloon payments. Pineda points out that debtors will owe millions of dollars in balloon payments at the end of the five-year term and the only evidence debtors presented on this issue was Mr. Odenkirk's statement that if DOC and QHI make the payments called for under the plan it is reasonable to expect that DOC will be able to obtain conventional bank financing or private financing for the balloon payments called for under the plan. According to Pineda, this self-serving, unsupported and conclusory opinion is insufficient as a matter of law to sustain a finding of feasibility.

We acknowledge that knowing the amount and character of claims is vital to assessing feasibility. While Pineda complains that the bankruptcy court has not yet determined the amount of its secured claim, the SAJP set forth stipulated values of Pineda's secured claim on the retained properties for purposes of plan confirmation. Whether or not those values will turn out to be different, we cannot say. Moreover, there was no evidence in the record showing Pineda was entitled to an administrative claim of over $500,000 for failed adequate protection. The bankruptcy court noted that Pineda had not moved for approval of any administrative priority claim prior to the confirmation hearing.

Because feasibility is an issue of fact, we give due regard to the bankruptcy court's evaluation of witness testimony and any inferences drawn by the court. In re Loop 76, LLC, 465 B.R. at 544. Factual issues such as how increases in fuel supply

-38-

will translate into greater sales and higher profits were central to the feasibility analysis. Certainly, the judge who heard the relevant testimony was in a better position to assess the testimony than we are on a paper record. Since Mr. Odenkirk's testimony was consistent with the evidence, we will not disturb the bankruptcy court's assessment of credibility on appeal. See Anderson, 470 U.S. at 575.

Finally, we are not persuaded that the bankruptcy court's findings regarding the balloon payments are clearly erroneous. Mr. Odenkirk's opinion that the balloon payments could be made if DOC made all the payments required under the SAJP was not binding on the bankruptcy court even if no contradictory evidence was offered by the other side. See Ark. Natural Gas Corp., 321 U.S. 620, 627-28 (1944) (it is not error for the factfinder to reject expert opinion evidence, even if uncontroverted). However, the bankruptcy court had discretion whether to credit Mr. Odenkirk's opinion regarding the balloon payment and afford it the appropriate weight. Here, the bankruptcy court observed that there was no evidence that the real property would decline in value over the term of the plan. Moreover, Mr. Odenkirk's opinion regarding refinance was conditioned on DOC's payments under the SAJP to its secured creditors. Under these circumstances, the bankruptcy court could reasonably conclude that it was conceivable DOC could refinance the properties at the end of the five-year term.

In sum, upon our review of the record, there was adequate evidence to support debtors' relatively low threshold of proof on feasibility. Accordingly, the bankruptcy court's finding of

-39-

feasibility was not clearly erroneous.

### 3. The Bankruptcy Court Did Not Err By Finding That The SAJP Complied With § 1129(b)(2)(A)(i)(II).

The bankruptcy court may confirm a plan without the consent of an impaired class of secured creditors if the plan meets the cramdown provisions of § 1129(b). Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.), 293 B.R. 489, 498 (9th Cir. BAP 2003). A plan proposing a cramdown of a secured claim may be confirmed if the plan is fair and equitable with respect to the objecting class. § 1129(b)(1).

Fair and equitable treatment of a secured creditor requires that the creditor retain the lien securing its claim (§ 1129(b)(2)(A)(i)(I)) and that the creditor receive deferred cash payments with a present value at least equal to the value of its claim (§ 1129(b)(2)(A)(i)(II)). In re Arnold & Baker Farms, 85 F.3d at 1420. Deferred cash payments to an impaired class must be valued as of the effective date of the plan and "consist of an appropriate interest rate and an amortization of the principal which constitutes the secured claim." Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.), 994 F.2d 1160, 1169 (5th Cir. 1993).

The SAJP provides that Pineda's secured claims will be amortized over twenty-five years and paid monthly with interest at 5% per annum, with the remaining balance to be paid at the end of year five of the plan. In determining whether the 5% cramdown interest rate was appropriate, the bankruptcy court used the formula approach set forth in Till, 541 U.S. at 476.

In deciding on an interest rate in a chapter 11 case,

-40-

a bankruptcy court should apply the market rate of interest where there exists an efficient market. And, when no efficient market exists for a Chapter 11 debtor, then the Bankruptcy Court should employ the formula approach endorsed by the Till plurality.

In re VDG Chicken LLC, 2011 WL 3299089, at *8 (9th Cir. BAP April 11, 2011) (citing Mercury Capital Corp. v. Milford Conn. Assocs., L.P., 354 B.R. 1, 11–12 (D. Conn. 2006); Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. Homepatient, Inc.), 420 F.3d 559 (6th Cir. 2005)(finding the bankruptcy court did not err as a matter of law when it applied the Till formula to a chapter 11 cramdown)).

The bankruptcy court first found that it was undisputed that there was no efficient market for a loan to debtors. Next, the court considered the testimony of Mr. Odenkirk, who concluded that a 5% cramdown interest rate was fair and equitable. Although Mr. Odenkirk had used the 1.01% yield for a five-year treasury note as the base rate and then added a 4% risk factor, the bankruptcy court found that his ultimate conclusion of a 5% interest rate was supported by the formula approach in Till and current market lending conditions.

On appeal, Pineda contends that the bankruptcy court misapplied the formula approach. Pineda argues that the formula approach involves a two-step process: (1) it begins by looking to the national prime rate and (2) the court then adjusts the rate upward to account for various risk factors, including "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. Till, 541 U.S. at 479. Following this two step approach, Pineda asserts that the bankruptcy court should have added the risk

-41-

factor of 4% found by Mr. Odenkirk to the prime rate of 3.25% for a cramdown rate of 7.25%. Pineda maintains that the bankruptcy court's methodology was in error because the prime rate does not reflect any of the risks of lending to an insolvent chapter 11 debtor.

According to Pineda, even if the interest rate is reviewed under a clearly erroneous standard, there is no evidence in the record to support the appropriate risk adjustment is 1.75% since Mr. Odenkirk's testimony that the risk factors required a 4% adjustment was the only evidence on this issue. Pineda asserts that the court thus improperly substituted its own opinion of the correct risk adjustment for the evidence of record.

We disagree. Pineda overlooks that the Supreme Court in <u>Till</u> placed the evidentiary burden on the creditor to present evidence of a higher interest rate (the portion associated with the risk factor), reasoning that the creditors "are likelier to have readier access to any information absent from the debtor's filing." <u>Till</u>, 541 U.S. at 479.

> The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. The court must therefore hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment. Some of this evidence will be included in the debtor's bankruptcy filings, however, so the debtor and creditors may not incur significant additional expense. Moreover, starting from <u>a concededly low estimate and adjusting upward places the evidentiary burden squarely on the creditors</u>, who are likely to have readier access to any information absent from the debtor's filing (such as evidence about the 'liquidity of the collateral market,' . . . Finally, many of the factors relevant to the adjustment fall squarely within the bankruptcy court's area of expertise.

Here, the bankruptcy court did not have to accept Mr. Odenkirk's 4% risk factor and Pineda offered no evidence of its own on the risk adjustment. The bankruptcy court properly considered the national prime rate (3.25%), market conditions, the feasibility of the plan, and noted that there was no evidence that the real property would decline in value over the term of the plan. In addition, the court noted that the prime rate already had a built in risk factor. Accordingly, based on the totality of the circumstances in the case, the bankruptcy court could reasonably conclude that a risk adjustment of 1.75% was appropriate and thus the appropriate cramdown interest rate should be 5%. Since we give substantial deference to the bankruptcy court's cramdown interest rate determination, the bankruptcy court's finding was not clearly erroneous.

In re Yett, 306 B.R. at 290.

### 4. The Bankruptcy Court Did Not Err By Finding That The SAJP Complied With § 1129(b)(2)(B)(ii).

Since debtors' SAJP Plan was not accepted by every impaired class of claims, it may only be confirmed pursuant to the so-called cram down provisions of § 1129(b), which bring into play the absolute priority rule. The absolute priority rule, which is set forth in § 1129(b)(2)(B)(ii), requires that "'a dissenting class of unsecured creditors . . . be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.'" Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988).

In this case, the Dunlaps, as equity holders, are in a class of creditors junior to Pineda's unsecured claims which are

-43-

not being paid in full. Thus, application of the absolute priority rule would bar the Dunlaps from retaining any property, including their ownership interest in the reorganized debtor, DOC. However, debtors sought to utilize the new value exception to overcome the absolute priority rule.

To satisfy the new value exception to the absolute priority rule, and to satisfy § 1129(b)(2)(B)(ii) notwithstanding the objection by an unsecured class that is not paid in full, former equity owners are "required to offer value that was 1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received." In re Bonner Mall P'ship, 2 F.3d at 909. The bankruptcy court found that all these elements were met. The court found that the funds were "clearly new" and that the $250,000 was substantial because it constituted in excess of 5% of debtors' unsecured claims. The bankruptcy court also found the funds were money or money's worth and were necessary for an effective reorganization. Finally, the court found that the cash contribution was more than reasonably equivalent to the value of the equity interest retained.

On appeal, Pineda challenges the bankruptcy court's finding on the substantial element. Citing case law where the courts rejected a new value contribution when the proposed new value was equal to 3.7% to 4.4% of unsecured debt, Pineda contends that the 5.49% which applies to this case is insufficient. Next, Pineda contends that a portion of the new value contribution is a transfer of the cash surrender value of a life insurance policy held by a self-settled trust of Ken and Carol

-44-

Dunlap. According to Pineda, because the Dunlaps are debtors in their own bankruptcy, this transfer is avoidable as a fraudulent transfer and an unauthorized post-petition transfer.

The Ninth Circuit has declined to specifically adopt a particular methodology for determining whether a contribution is substantial, holding instead that a "de minimis contribution" does not satisfy the new value exception. Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship, 115 F.3d 650, 655 (9th Cir. 1997). There, the court noted that several different considerations may be relevant in the analysis, including comparing the amount of the contribution to total unsecured claims, comparing the contribution to the amount of claims being discharged, and considering the extent of the dividend being paid on unsecured claims by virtue of the contribution. Id.

While the bankruptcy court considered only the first comparison — the amount of the contribution to total unsecured claims — it implicitly concluded that the 5.49% was not so de minimis as to fail the substantial contribution factor as a matter of law. Compare Matter of Woodbrook Assoc., 19 F.3d 312, 320 (7th Cir. 1994) ($100,000 contribution not substantial because it is only 3.8% of $2.6 million unsecured debt); In re Snyder, 967 F.2d 1126, 1132 (7th Cir. 1992) ("the disparity between the contribution and the unsecured debt," at most $22,000 or 2.2% of approximately $1,000,000 unsecured claims, was "so extreme . . . there [was] no need to proceed any further . . . ."); and Travelers Ins. Co. v. Olson (In re Olson), 80 B.R. 935 (Bankr. C.D. Ill. 1987) ($5,000, or only 1.56% on the $320,000 due all unsecured creditors, held

-45-

insubstantial), aff'd, 1989 WL 330439 (C.D. Ill. Feb.8, 1989), with State St. Bank and Trust Co. v. Elmwood, Inc. (In re Elmwood, Inc.), 182 B.R. 845, 853-54 (D. Nev. 1995) (affirming bankruptcy court's decision that $150,000 contribution which was less than 4% of unsecured debt was substantial in light of other factors).

Here, the 5.49% ratio is above those in the case law cited above, none of which is binding on the bankruptcy court or this Panel. We are thus not convinced that the bankruptcy court made an error in its determination that the contribution, when viewed as a percentage of the unsecured claims, was substantial. Furthermore, there is no indication that the parties or the court took into consideration that the equity holders were contributing real property. See Matters of Treasure Bay Corp., 212 B.R. 520 (Bankr. S.D. Miss. 1997) (Real property that equity holders proposed to contribute in return for interest in reorganized debtor qualified as "money or money's worth," which could be counted in deciding whether equity holders' contribution was sufficient to permit application of the new value exception to the absolute priority rule). Given our deferential review standards, we uphold the bankruptcy court's conclusion that the requirements for the new value exception have been met.

The bankruptcy court made no findings concerning Pineda's fraudulent transfer theory and there is no evidence in the record to support such a theory.

### VI. CONCLUSION

In sum, Pineda's arguments do not provide a basis for

-46-

reversal of the confirmation order.  For the reasons stated, we AFFIRM.[13]

---

[13] In light of our conclusion, we do not address the bankruptcy court's decision denying Pineda's motion to convert or dismiss.